**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION, )
)
                          **Plaintiff,**  )
)
v.                                            )
)
NATHALIA I. BURGOS,               )
)
                         **Defendant.**  )
)

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND**
**DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**I.**      **INTRODUCTION**

1.      From at least December 2020 through August 2021, Defendant Nathalia I. Burgos ("Burgos") personally solicited and raised at least $82,000 from 10 to 13 investors on behalf of MJ Capital Funding, LLC ("MJ Capital") and its affiliate MJ Taxes and More, Inc. ("MJ Taxes") (collectively, the "MJ Companies") in an unregistered fraudulent securities offering. Burgos also misappropriated investor funds and knew from her 50% ownership of the MJ Companies and her control over their bank accounts and corporate credit card that the MJ Companies and their insiders were likewise misappropriating and misusing investor funds.

2.      The MJ Companies and their other owner, chief executive offer, and president, Johanna M. Garcia ("Garcia"), operated the MJ Companies as a Ponzi scheme, which, from at least June 2020 through August 2021, raised over $196 million from more than 15,400 investors nationwide through an unregistered fraudulent securities offering. Garcia and the MJ Companies tricked investors into thinking their investment would be used to fund small business loans called

Merchant Cash Advances ("MCAs") in exchange for a percentage of the business' income over a specified period of time. In reality, investors' outsize annualized "returns" of 120% – 180% were funded with money obtained from new investors.

3. The Ponzi scheme collapsed once the Commission filed its emergency action to stop this ongoing fraud on August 9, 2021, against Garcia and the MJ Companies (collectively, the "MJ Defendants"). *SEC v. MJ Capital Funding, LLC, et al.*, Case No.: 21-61644-CIV-AHS (S.D. Fla.). On August 11, 2021, the Court granted the Commission's motions for an asset freeze and injunctive relief against the MJ Defendants and the appointment of a receiver over the MJ Companies.

4. Burgos played a significant role in perpetrating the Ponzi scheme. Burgos told investors that their money would be used to fund the MJ Companies' purported MCA business and, in exchange, they would receive returns of 10% or more per month along with the return of their principal investment upon maturity. But Burgos knew her statements were false. At all relevant times, she had signature authority over MJ Capital's and MJ Taxes' bank accounts, and accessed those accounts numerous times. She was aware from the activity in those accounts that only a small fraction of investor funds was used to make MCAs. Instead, most of the investor funds were used to pay fictitious returns to existing investors, undisclosed commissions to sales agents who promoted investments in the MJ Companies, and personal expenses for insiders of the MJ Companies, including Burgos. As such, investors' ability to receive the promised returns and repayment of principal was dependent on a rising stream of funds from new investors, and by convincing existing investors to renew their existing investments, thus deferring the MJ Companies' need to repay investors their principal investment.

5. Burgos also controlled MJ Capital's corporate credit. She charged approximately $39,000 in personal expenses on the card and knew from its activity that other insiders racked up at least $1.3 million in primarily personal expenditures, all of which was paid with investor funds.

6. The MJ Companies' securities were not registered with the Commission, nor did they qualify for an exemption from registration. Burgos thus was not permitted to sell the MJ Companies' securities.

7. By engaging in this conduct, Burgos violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.   **DEFENDANT**

8. Burgos is a resident of Boca Raton, Florida. Burgos was the vice president, secretary and 50% owner of MJ Taxes, and the vice president and 50% owner of MJ Capital.

## III.   **OTHER RELEVANT ENTITIES AND INDIVIDUAL**

9. MJ Capital is a Florida limited liability company located in Pompano Beach, Florida. Garcia formed MJ Capital in June 2020 and is its Manager, an Authorized Member, and President. MJ Capital purports to be in the business of providing merchant cash advances to businesses located in Florida and throughout the United States. MJ Capital claimed to fund millions of dollars in merchant capital loans to small business owners in exchange for a percentage of the business' income over a specified period of time, with the amount of such funding having steadily increased every month since its inception in 2020. The total amount to be repaid is supposedly calculated by a factor rate, a multiplier generally based on a business' financial status. The Court appointed the

Receiver over MJ Capital on August 11, 2021, and entered a Judgment for Permanent Injunctive Relief against MJ Capital on October 1, 2021.

10. MJ Taxes is a Florida corporation located in the same office as MJ Capital in Pompano Beach. Garcia incorporated MJ Taxes in December 2016 as MJ Tax Services & More Inc. and is its President. In March 2020, Garcia changed the company's name to MJ Taxes and More Inc. The Court appointed the Receiver over MJ Taxes on August 11, 2021, and entered a Judgment for Permanent Injunctive Relief against MJ Taxes on October 1, 2021.

11. Garcia is a resident of North Lauderdale, Florida. Garcia controlled the MJ Companies prior to their going into receivership. On September 8, 2021, the Court, by consent, entered a preliminary injunction against Garcia. On August 24, 2023, Garcia was indicted on charges for conspiracy to commit wire fraud and mail fraud, 18 U.S.C. § 1349, wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341, based on the conduct alleged herein. *United States v. Garcia*, Case No. 23-cr-20350-JEM (S.D. Fla.).

### IV. JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

13. This Court has personal jurisdiction over Burgos, and venue is proper in the Southern District of Florida, because many of Burgos' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida, where Burgos resides and conducts business.

14. In connection with the conduct alleged in this Complaint, Burgos, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

V. **FACTS**

A. **The MJ Defendants' Securities and Solicitation of Investor Funds**

15. Since at least June 2020, MJ Taxes began soliciting investments, agreeing to pay annual returns of varying amounts, typically 120%, for six-month investments. Between June 2020 and September 2020, MJ Taxes and investors entered into written agreements, signed by Garcia on behalf of MJ Taxes, called a Loan Agreement. These agreements refer to the investor as "Investor" or "Lender" and MJ Taxes as the "Facilitator" or "Borrower."

16. Beginning at least as early as October 2020, MJ Capital became the primary investment vehicle for raising funds from investors. From October 2020 until the Ponzi scheme collapsed in August 2021, MJ Capital entered into written agreements with investors called a Merchant Cash Advance Agreement. These agreements refer to the investor as the "Purchaser," and MJ Capital agrees that it will use the investor's money to fund an MCA. MJ Capital promises an annual return of varying amounts, typically 120%, with MJ Capital guaranteeing repayment of principal if the merchant defaults. The term of the investment is either 6 months, 9 months, 12 months or 6 months with an option by the investor to extend the term for an additional 6 months.

17. In addition to the written agreement, MJ Capital required investors to sign: a Non-Disclosure Agreement, where the investor would agree not to disclose confidential information about MJ Capital; a Purchaser Non-Compete Agreement, where the investor would agree not to engage in any business that would compete with MJ Capital for two years; an IRS W-9 form; and

a Referral Program Agreement, which allowed an investor to receive a one-time referral bonus of an unspecified amount for each referred person who invests with MJ Capital.

18.  The MJ Companies solicited investors through its own employees, external sales agents, and word-of-mouth.

19.  MJ Capital employed a multi-tiered sales team to solicit investors and a complex payment system to pay these agents. The sales team hierarchy was as follows: Board Member, Manager, Team Leader, and Account Representative. Multiple undisclosed commission payments, which came out of the offering proceeds, were paid to each agent in this hierarchy based on each investment.

20.  MJ Capital also solicited investors through its website and social media. MJ Capital's then website, www.mjcapitalfunds.com (the "Website"), whose domain name was registered on July 29, 2020, represented that MJ Capital was in the business of funding MCAs and that investor money would be used for this purpose. The Website provided background information on how MJ Capital can assist small businesses with merchant cash advances and further invited business owners to fill out an online application for funding. For example, the Website stated that MJ Capital could provide "an alternative option to satisfy a business's financial needs", and that it had a "pipeline of investors" from whom the business could expect "cash of up to $200,000 to fulfill [its] needs . . . ."

21.  At least as early as May 12, 2021, the Website's "blog" section stated: "[MJ Capital] has grown to an extent where there is a team of underwriters who qualify every company that seeks funds from MJ Capital. There are no exceptions to this! The process consists of checking 6 months' worth of bank statements, last year's tax returns, and [the merchant's] profit and loss sheet for the last year."

22. Additionally, at least as early as May 12, 2021, MJ Capital represented through social media that it is in the business of funding MCAs and offers "quick approvals," "fast funding," "flexible terms" and "help[s] small businesses". Its then Twitter page touted: "MJ Capital specializes in MCA funding for businesses, our goal is to help you and your business thrive during uncertain times by working with our team."

23. In or around June 2021, an undercover Federal Bureau of Investigation agent ("UC") posing as a prospective investor spoke with MJ Capital's officer manager at MJ Capital's office in Pompano Beach. The office manager explained, among other things, that MJ Capital would use the UC's funds to purchase future sales or profits of companies and the UC would make a 10% monthly return, an underwriting team determines a merchant's ability to repay, and MJ Capital has liens on a merchant's projects as further security.

24. The Loan Agreements and Merchant Cash Advance Agreements (the "Agreements") are investment contracts. Investors looked solely to the MJ Companies to produce returns, and the MJ Companies' ability to do so depended entirely on their ability to either fund profitable MCAs or attract new investors to cover payments to existing investors. The Agreements are also notes. As investment contracts and/or notes, the Agreements are securities within the meaning of the Securities Act and the Exchange Act. These securities have not been registered with the Commission.

**B.    The MJ Defendants' Material Misrepresentations to Investors and Misuse and Misappropriation of Investor Funds**

25. The representations that the MJ Companies were using investor money to fund MCAs and that their money was secure were lies. In fact, the MJ Companies made very few MCAs, they did not file liens in connection with the few MCAs they did make, and investors' ability to receive the promised returns and repayment of principal was dependent on the MJ Defendants'

ability to continue to raise new investor money and convince existing investors to extend the term of their agreements.

26. From June 2020 through August 2021, the MJ Companies received at least $196 million in investor funds from investors in Florida and several other states. However, the MJ Companies only made approximately $923,000 in MCAs. During that same time period, the MJ Companies received approximately $316,500 in repayment for those MCAs.

27. From June 2020 through August 2021, the MJ Companies misused investor funds by making payments totaling at least $62.3 million to sales agents for promoting investments in the MJ Companies. The MJ Companies also misused investor funds by making payments on loans owed by MJ Taxes via transfers to MJ Taxes' bank account.

28. From June 2020 through August 2021, Garcia and the MJ Companies also misappropriated at least $7.35 million of investor funds on a variety of purchases unrelated to the business, including credit card payments, travel, entertainment, restaurants, and luxury goods and clothing.

29. Because the MJ Companies made few MCAs and were diverting substantial investor money, the MJ Companies were not earning anywhere near the revenue needed to pay the promised returns to investors.

30. From June 2020 through August 2021, the MJ Companies paid at least $108.9 million in purported returns to investors. However, instead of paying investors out of the revenue of the business, the MJ Companies used new investor money to pay returns to existing investors.

31. The investments in the MJ Companies were not secure. To the contrary, the only way the MJ Companies could honor their obligations to investors would be by successful

continuation of their fraudulent scheme. Once the supply of new investors was exhausted, the MJ Companies would be unable to pay the promised returns to existing investors.

### C. Burgos' Material Misrepresentations to Investors, Misuse and Misappropriation of Investor Funds, and Offer and Sale of Securities in Unregistered Transactions

32. Burgos played a significant role in the MJ Companies' Ponzi scheme.

33. From at least December 2020 through August 2021, Burgos personally solicited and raised at least $82,000 from 10 to 13 investors on behalf of the MJ Companies.

34. Burgos utilized MJ Capital's website to solicit investors. Burgos represented to investors and prospective investors that their funds would be used to make MCAs, and that they would receive returns of 10% or more per month and the return of their principal upon maturity.

35. Burgos sometimes collected investor funds, and other times she instructed investors to send money directly to MJ Capital.

36. After investing through Burgos, investors would receive a signed MCA Agreement from the MJ Companies, which was signed by Burgos, Garcia or someone as authorized representatives of the MJ Companies.

37. Additionally, Burgos controlled MJ Capital's and MJ Taxes' bank accounts. She accessed those accounts numerous times from at least June 2020 through September 2021. The activity in those accounts during her times of access revealed that the MJ Companies were misusing and misappropriating investor funds. Millions of dollars were moving in and out of those accounts which steadily increased from tens of thousands, to hundreds of thousands, to millions, during the range of her access dates.

38. Burgos also was the primary cardholder on MJ Capital's American Express corporate card. She controlled this account and kept track of the spending of other cardholders.

The spending on the card included extravagant personal expenditures totaling approximately $1.3 million between January and August 2021, all of which was paid using investor funds. Burgos also personally misappropriated investor funds by charging about $39,000 in personal expenses on MJ Capital's corporate card, including flights, hotel stays, furniture, and plastic surgery.

39. Burgos's representations that the MJ Companies would use investor money to fund MCAs was false. Investor funds were rarely used to fund MCAs. Instead, Burgos, the MJ Defendants, and others misused and misappropriated investor funds.

40. Burgos had ultimate authority for the false and misleading statements she made to investors and prospective investors, and in the documents, such as the Agreements, she signed and provided to investors and prospective investors.

## VI. CLAIMS FOR RELIEF

### COUNT 1

### Violations of Sections 5(a) and (c) of the Securities Act

41. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

42. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by the MJ Companies described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

43. From at least as early as December 2020 through August 2021, Defendant directly and indirectly:

    (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

  (b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

  (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

44. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT 2

### Violations of Section 17(a)(1) of the Securities Act

45. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

46. From at least as early as December 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

47. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT 3

### Violations of Section 17(a)(2) of the Securities Act

48. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

49. From at least as early as December 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

50. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 4

### Violations of Section 17(a)(3) of the Securities Act

51. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

52. From at least as early as December 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

53. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 5

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

54. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

55. From at least as early as December 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

56. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 6

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

57. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

58. From at least as early as December 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

59. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 7

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

60. The Commission adopts by reference paragraphs 1 through 40 of this Complaint.

61. From at least as early as December 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails,

knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

62. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendant committed the violations of the federal securities laws alleged herein and:

### A. Permanent Injunctive Relief

Issue a Permanent Injunction enjoining Defendant from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### B. Disgorgement

Issue an Order directing Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### C. Civil Penalty

Issue an Order directing Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d).

### D. Officer and Director Bar

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

September 22, 2023					Respectfully submitted,

							By:	*/s/ Stephanie N. Moot*
								Stephanie N. Moot
								Senior Trial Counsel
								Fla. Bar No. 30377
								Direct Dial:  (305) 982-6313
								Email:  moots@sec.gov

								Attorneys for Plaintiff
								**SECURITIES AND EXCHANGE COMMISSION**
								801 Brickell Avenue, Suite 1950
								Miami, Florida 33131
								Telephone:  (305) 982-6300
								Facsimile:  (305) 536-4146